Attest:

Robt J Schwartz
Secretary.

Sylvan **LEMAIRE**, on behalf of himself and all other bondholders of Kentucky and Indiana Terminal Railroad Company, similarly situated, Plaintiff,

v.

**KENTUCKY AND INDIANA TERMINAL RAILROAD COMPANY**, The Baltimore and Ohio Railroad Company, Chicago, Indianapolis & Louisville Railway Company and Southern Railway Company, Defendants.

United States District Court
S. D. New York.
March 12, 1956.

Milton Pollack, New York City, Milton Pollack, Samuel N. Greenspoon, Sidney K. Nadelson, New York City, of counsel, for plaintiff.

Davis, Polk, Wardwell, Sunderland & Kiendl, New York City, Ralph M. Carson, Thomas O'G. Fitz Gibbon, Henry L. Walker, Jr., New York City, Louis Seelbach, Louisville, Ky., Francis W. Phillips, New York City, of counsel, for defendants.

CASHIN, District Judge.

This is a class action by the plaintiff, Sylvan Lemaire, on behalf of himself and

all other bondholders of the defendant, Kentucky And Indiana Terminal Railroad Company (hereafter K & I), similarly situated. Plaintiff seeks a declaratory judgment as to the amount of principal and interest payable on certain "Coupon Gold Bonds" issued by the defendant K & I and guaranteed by the defendants, The Baltimore and Ohio Railroad Company, Chicago, Indianapolis & Louisville Railway Company and Southern Railway Company.

### Findings of Fact

1. Sylvan Lemaire, a citizen of New York State, is the holder of the 174 £100 First Mortgage 4½% Coupon Gold Bonds, issued by the defendant K & I in 1911. Plaintiff, with full knowledge of defendants' position, has acquired all of these bonds since May 1953, and they are part of a class of 2,467 of the defendant K & I's bonds which remain outstanding of an original issue in that year for the face amount of £1,291,000.

2. The defendants are all domestic companies, organized and existing in states other than New York.

3. The caption on the face of the bond appears in the following form:

"£100 £100
Kentucky and Indiana
Terminal Railroad Company
No. 1315 No.1315
First Mortgage 4½% Coupon Gold Bond.
Payable January 1, 1961.
For value received * * *"

Superimposed over the text of the bond in the centre of its face, in letters over an inch high, is the word "Gold".

4. The interest coupon attached to the bond appears as follows (the plaintiff holds 542 of these coupons):

"No. £2 5s.
"On the 1st day of ——— Kentucky & Indiana Terminal Railroad Company will pay to bearer two pounds and five shillings, Sterling money of the United Kingdom of Great Britain and Ireland, at the agency of the Company in the City of London, England, free of all taxes as mentioned in the bond,—being six months' interest on its First Mortgage Gold Bond No. .

"Treasurer."

5. The operative language in the text of the bond reads:

Promises to pay to bearer * * * One hundred pounds, Sterling money of the United Kingdom of Great Britain and Ireland, at the office or agency of the Company in the City of London, England, on the 1st day of January 1961, with interest thereon at the rate of four and a half per cent. per annum from the 1st day of January, 1911, payable semi-annually, in like gold coin, at said agency".

The bond also reads:

"This bond is one of an issue of coupon and registered bonds of the Company to an amount not exceeding in the aggregate the equivalent of Two Million pounds sterling, known as its First Mortgage 4½% Gold Bonds, secured by its mortgage or deed of trust dated the 3rd day of January, 1911, executed by the Company to The Standard Trust Company of New York, Trustee, conveying all the property of the Company upon terms and conditions therein set forth, to which mortgage or deed of trust reference is now made".

The First Mortgage, at page 2 (Plaintiff's Exhibit 4) sets forth the stockholders' resolution authorizing the issuance of the bonds, and reads in part as follows:

"Resolved * * * to secure an issue of bonds for the aggregate principal sum of Two Million pounds sterling, the principal thereof payable in gold coin of the United Kingdom of Great Britain and Ireland, at the office or agency of this company in the City of London, England (or in money of any other government, and elsewhere payable, as from time to time hereafter may be

determined by the board of directors), on the 1st day of January, 1961, with interest thereon from January 1st, 1911, at the rate of 4½ per centum per annum, payable semi-annually in like gold coin * * *."

All other references in the mortgage and the prospectus to the amount to be borrowed or to be paid, are in pounds sterling including the Directors' Resolution authorizing the issuance of the bonds (except where the form of the bond is set out as above).

6. In England, in 1911, pursuant to the Coinage Act of 1870, the gold coin, which was the equivalent of the English pound sterling, was the sovereign and contained .23542 Troy ounces of fine gold, and this gold content had existed unaltered for over two hundred years.

7. In 1911 England's monetary system was on a gold basis and its currency, Bank of England notes, was freely convertible to gold coins of a fixed weight and fineness, and such had been the case for over one hundred years. In 1911 the only legal tender in England was bronze coins for amounts of one shilling or less; silver coins for amounts of 40 shillings or less; Bank of England notes for all amounts above £5; and gold coin for any amount. Bank of England Act of 1833, 1 Chitty's Statutes 658, 6th Ed.; Coinage Act of 1870, 14 Chitty's Statutes 591, 6th Ed.

8. The defendant K & I since 1911 to date has always serviced these bonds in pound sterling simpliciter. In 1931–1932 inquiry was made of the defendants and their agents as to whether these bonds contained a gold value clause but apparently all bondholders accepted payment in sterling, even though from 1915 to 1925 the value of the pound in United States dollars was substantially less than the $4.86 which existed in 1911.

9. In January of 1916 the defendant authorized, upon the payment of a 2% premium, the stamping on all bonds presented the additional right to demand payment under these bonds as follows:

"In gold coin of the United States of the standard of weight and fineness existing January 1, 1916, at the fixed rate of $4.8665 to the pound sterling".

and a total of 9,585 of the 1911 issue was so stamped. These bonds are not in suit. The Joint Resolution of Congress of June 5, 1933.

10. In October of 1925 the defendant successfully applied for listing of these bonds on the New York Stock Exchange. In their application they described the bonds as follows:

"Both principal and interest of the unendorsed bonds are payable in gold coin of the United Kingdom of Great Britain and Ireland".

11. In 1932 Walter Mendelsohn, a bondholder, commenced an action which he amended to a class action in 1933 against the defendants herein in the Jefferson Circuit Court of Kentucky for a declaration that these bonds were payable as gold value obligations. The case was never tried and on December 30, 1948, the action was discontinued on the plaintiff's own motion. There was no determination of any kind on the merits in that case.

12. Shortly after the devaluation of the English pound in 1949 from $4.02 to $2.80 the defendant K & I purchased 1,458 of these bonds at the average cost of $232.21 per bond. These purchases left outstanding the 2,467 bonds of the original issue which are in suit here.

13. The plaintiff here has demanded payment of the interest coupons on the bonds which he holds, at the rate of approximately $8.24 per pound sterling, that being the present dollar value of the quantity of gold contained in an English sovereign as it existed in 1911. Gold Regulations of United States Treasury Department, Sec. 54.4(9) iii; (12) b.

14. The defendant has paid other bondholders and offers to pay this plaintiff approximately $2.80 per pound sterling on these interest coupons, that being the present dollar value of the English pound sterling.

15. At the present time it is unlawful to possess gold coins in England. Exchange Control Act [1947] 16 Halsbury's Statutes, 559. There exists no impediment in English law to the performance of a gold value obligation and such an obligation will be imposed if it clearly appears that it was the intent of the parties. Feist v. Societe Intercommunale Belge d'Electricite [1934] AC 161; New Brunswick Ry. Co. v. British and French Trust Corp. [1939] AC 1; Treseder-Griffin v. Co-Operative Ins. [1955] 3 All ER 793 (Q.B.D.).

### Conclusions of Law

I. Plaintiff's complaint is dismissed. Judgment to be entered for the defendants.

The jurisdiction of the Court in this case is based on diversity of citizenship. The action is on a contract which was made, and to be performed, in London, England. The New York law of conflicts is controlling, Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477, and in accordance with it English law controls the construction and performance of this contract. Swift & Co. v. Bankers Trust Co., 280 N.Y. 135, 19 N.E.2d 992.

The only real issue in this case is whether or not the defendant's bonds contain a "gold value" clause, that is, a clause which connotes a secondary promise to pay currency to the equivalent value of a certain quantity of gold.

At first blush the contractual provisions of the bond would appear ambiguous, in that the obligor promises to pay the principal in £100 sterling money and the interest at the rate of 4½% per annum *in like gold coin*. It would seem that the words "in like gold coin" import a prior use of the words "gold coin" and therefore would justify its being read into the principal obligation. Further, it is the law in England, as it is here, that obligations of this kind must be construed "contra proferentem". Fowkes v. Manchester and London Assur. Asso., 3 B & S. 917; 122 Eng.Rep. 343 (Q. B. 1863).

However, it is the opinion of the Court that such a construction is not justified where there exists any reasonable explanation of the use of the words "gold coin" with respect to the interest as distinguished from the principal. New Brunswick Ry. Co. v. British and French Trust Corp., supra. We think such an explanation does exist, as will later appear.

Nevertheless, merely for the purposes of discussion, we will examine the payment clause as though it contained the words "gold coin" with respect to the principal.

It is the plaintiff's contention that the words "gold coin" must have a significance and that the only significance they can have under the English cases is that they connote a gold value clause. The plaintiff relies heavily on three text books—Dicey's Conflict of Laws [1949] pp. 727–728; Mann, The Legal Aspect of Money [1933] pp. 114–115; Nussbaum, Money In The Law [1950] pp. 248, 250–1, and well he might for all three support his position.

It is the contention of the defendants on the other hand that the use of the words "gold coin" in the bond is merely descriptive of sterling money at the time of issue. In support of their position they rely on these circumstances. That a debt expressed in pounds sterling could, in 1911, be lawfully discharged only by payment of gold coin or Bank of England notes freely convertible into gold coin. That for over one hundred years the English pound sterling had been on a continuous gold basis. That for over thirty years the defendants in this case have serviced these bonds in pound sterling simpliciter, without reference to any gold value. That the interest coupons, the directors' resolution, the principal payment clause in the bonds and the prospectus expressed the obligation to pay in pounds sterling, without reference to gold coin.

There are three English decisions which deal directly with the question we have before us.

In the first case—Feist v. Societe Intercommunale Belge d'Electricite, supra —the payment clause in a bond issued on September 1, 1928, read, as to both principal and interest

"in gold coin of the United Kingdom of or *equal* to the standard of weight and fineness existing on September 1, 1928".

The decision of the House of Lords noted the fact that by virtue of the Currency and Bank Notes Act of 1928 at the time the bonds were issued, gold coin was substantially no longer in circulation. They held the only proper interpretation of the clause was that the obligor promised to pay the principal and interest in a sum in pound sterling equal to the gold value of the nominal amount, such gold value to be ascertained in accordance with the standard of weight and fineness existing on September 1, 1928.

In the next case—New Brunswick Ry. Co. v. British and French Trust Corp., supra—the payment clause of the principal in a bond described as a First Mortgage Gold Bond, issued in 1884, read as follows:

" * * * the sum of £100 sterling, gold coin of Great Britain, of the present standard of weight and fineness".

The interest clause read:

"With interest thereon at the rate of £5 sterling per centum, per annum, payable semi-annually".

In that case the English House of Lords held that the Feist case must not be restricted to its particular facts and the bond clearly expressed a gold value clause with respect to principal. However, since there was no clear expression of a gold clause obligation as to the interest payments, the interest was payable in sterling simpliciter. The Court also held that there was no justification for the lower Court reading "sterling" as meaning "sterling as aforesaid", in considering the interest payment clause.

While the case before us was on trial another case—Treseder-Griffin v. Co-Operative Ins., supra—was decided. In that case a clause in a lease, executed in December 1938, read as follows:

"Payment therefor yearly during the said term either in gold sterling or Bank of England's notes to the equivalent value in gold sterling, the rent of £1900."

Lord Goddard, the Lord Chief Justice of England, sitting in the Queen's Bench Division, held that the lease contained a gold value clause. It is worthy to note that even on the facts of that case Lord Goddard expressed his pleasure that (p. 796) "This judgment can and, no doubt, will be considered by the Court of Appeal, and perhaps the House of Lords, as in view of the present falling rate of the pound and the length of the lease, the amount of money involved is truly formidable".

With all due respect to the text writers relied on by the plaintiff, it is the opinion of the Court that the English cases above do not support the proposition that whenever the words "gold coin" are used a gold value clause must inevitably be inferred. Rather, it is our view that English law, as evidenced by these cases, requires that a reference to gold in a payment clause be not ignored but be given full effect if it clearly expresses the intention to fix a money value equivalent to a certain quantity of gold.

Plaintiff contends here that since the sovereign was the English coin equivalent to the pound sterling in 1911, and since the weight and fineness of that coin has been constant for over two hundred years, a weight and fineness phrase after the words "gold coin" would be sheer surplusage. We would agree with this contention if the payment clause in the bond here otherwise contained language of equation as in Treseder-Griffin v. Co-Operative Ins., supra. Such is not the case.

The plaintiff seeks a construction which would require us not only to imply the standard of weight and fineness of the gold but also the language of equation. The language of equation, we feel, is the essence of a gold value clause un-

less there exist extrinsic circumstances such as supply the defect. (Gold coin no longer being in circulation or reference to an artificial gold unit, etc.). See Serbian Loan Case, Permanent International Court of Justice, Series A, Collection of Judgments 1927–1930, Judgment No. 14; Brazilian Loan Case, Permanent International Court of Justice, Series A, Collection of Judgments 1927–1930, Judgment No. 15.

▮ It is our opinion, therefore, that even reading in the words "gold coin" with respect to the principal, that this bond does not contain a gold value clause under the law of England. We think after examining the bond, the interest coupons attached, the mortgage to which the bond refers, the stockholders' resolution contained in the mortgage, the directors' resolution also contained therein, the prospectus and the monetary laws of England as they existed in 1911, that no gold value clause was expressed or intended.

The view that the words "gold coin" are used in a descriptive sense in this bond is further supported by the fact that we find in the English monetary laws as of 1911 a reasonable explanation for the use of the words "gold coin" with respect to interest payment as distinguished from the principal in this bond. This is also the reason referred to above for refusing to imply the words with respect to the principal.

The only money which had to be recognized as legal tender for the discharge of a debt in 1911 in England was bronze coins for the sum of one shilling or less, silver coins for the sum of 40 shillings or less, gold coins (which were coined in 5, 2, 1, ½ pound sterling denominations) for any amount, or Bank of England notes for amounts over £5. The semi-annual payments of the bond in suit amount to £2 5s or 45 shillings. Such an obligation could not be legally discharged in England in 1911 except by the tender of some gold coin. We are mindful of the fact that 5 shillings could not be paid in gold but we do not think it detracts from the significance of the fact that in 1911 a legally correct description of the money to be paid, in discharge of an obligation of £5 or less and more than 40 shillings would have to refer to gold coin.[1]

This interpretation does not explain the use of the word "like" (nor, in our opinion, does the New Brunswick case give full effect to all the words in the interest clause there), but it is less strained and requires none of the redrafting that plaintiff seeks. The plaintiff would have this Court construe from the words "like gold coin" their prior use as to the principal, then that the quantity of gold referred to was that contained in the sovereign and, lastly, that the value of the principal and interest to be paid was equated to it. In our opinion neither justice nor English law (we presume they are synonymous) permits such extensive redrafting of a contract by a court.

The defendants' defenses of res adjudicata and the Statute of Limitations, we think, are without substance and disposed of in our findings. All objections and motions to strike on which decision was reserved, are overruled and denied.

---

1. The bond here, though payable in London, refers to money of United Kingdom of Great Britain and Ireland as to both principal and interest. It also seems to have been the fact that in 1911 the only money that was legal tender throughout the United Kingdom of Great Britain and Ireland was gold coin. See 2 Halsbury's Statutes of England 2d Ed. p. 231 (note); Banker (Ireland) Act [1845]; Bank Notes (Scotland) Act [1845]. This would seem to be an additional reason why the words "gold coin" alone do not imply a gold value clause.

Contra: 18 Ency. Brit. 14th Ed. 382, but states bank notes were not issued in smaller denominations than £5.