242 F.2d 884
 Sylvan LEMAIRE, on behalf of himself and all other bondholders of Kentucky and Indiana Terminal Railroad Company, similarly situated, Plaintiff-Appellant,
v.
KENTUCKY AND INDIANA TERMINAL RAILROAD COMPANY, The Baltimore and Ohio Railroad Company, Chicago, Indianapolis & Louisville Railway Company and Southern Railway Company, Defendants-Appellees.
 No. 177.
 Docket 24204.
 United States Court of Appeals Second Circuit.
 Argued January 22, 1957.
 Decided April 2, 1957.
 
 Milton Pollack, New York City (Samuel N. Greenspoon, New York City, on the brief), for plaintiff-appellant.
 Ralph M. Carson, of Davis, Polk, Wardwell, Sunderland & Kiendl, New York City (Thomas O'G. FitzGibbon and Francis W. Phillips, of Davis, Polk, Wardwell, Sunderland & Kiendl, New York City, Henry L. Walker, Washington, D. C., and Louis Seelbach, Louisville, Ky., on the brief), for defendants-appellees.
 Before CLARK, Chief Judge, and LUMBARD and WATERMAN, Circuit Judges.
 CLARK, Chief Judge.
 
 
 1
 This appeal is from a decision, D.C. S.D.N.Y., 140 F.Supp. 82, declaring that the words "payable * * * in * * * gold coin" in certain bonds issued in Great Britain in 1911 merely described the currency in use there and did not constitute a gold value clause of the sort recognized in Feist v. Société Intercommunale Belge d'Électricité, [1934] A.C. 161. In the district court's view the issuer can discharge its obligation as to both principal and interest by paying the face amount of the bonds and coupons in current British legal tender of the same face amount. If, on the other hand, the bonds contain a gold value clause, the issuer is obliged on a £100 bond, for example, to pay an amount equal to the value of 23.542 troy ounces of fine gold, or roughly £300 at the current rate of exchange.
 
 
 2
 Plaintiff is the holder of 174 £100 First Mortgage 4½% Coupon Gold Bonds, issued by the defendant Kentucky & Indiana Terminal Railroad Company and guaranteed by its three corporate stockholders, who are also defendants. Plaintiff, with full knowledge of defendants' position, acquired all these bonds since May 1953, and they are part of a class of 2,467 bonds which remain outstanding of an original issue of £1,291,000. This class action by plaintiff for a declaratory judgment was brought in 1954 with jurisdiction based on the diverse citizenship of the parties.
 
 
 3
 The caption on the face of each bond states that it is a "First Mortgage 4½% Coupon Gold Bond," and superimposed over the text of the bond in the center of its face, in letters over an inch high, is the word "Gold." The operative language in the text of the bond reads:
 
 
 4
 "Promises to pay to bearer * * * One hundred pounds, Sterling money of the United Kingdom of Great Britain and Ireland, at the office or agency of the Company in the City of London, England, on the 1st day of January 1961, with interest thereon at the rate of four and a half per cent. per annum from the 1st day of January, 1911, payable semi-annually, in like gold coin at said agency."
 
 The bond also reads:
 
 5
 "This bond is one of an issue of coupon and registered bonds of the Company to an amount not exceeding in the aggregate the equivalent of Two Million pounds sterling, known as its First Mortgage 4½% Gold Bonds, secured by its mortgage or deed of trust dated the 3rd day of January, 1911, executed by the Company to The Standard Trust Company of New York, Trustee, conveying all the property of the Company upon terms and conditions therein set forth, to which mortgage or deed of trust reference is now made."
 
 
 6
 The mortgage sets forth the stockholders' resolution authorizing issuance of the bonds, which reads in part:
 
 
 7
 "Resolved * * * to secure an issue of bonds for the aggregate principal sum of Two Million pounds sterling, the principal thereof payable in gold coin of the United Kingdom of Great Britain and Ireland, at the office or agency of this company in the City of London, England (or in money of any other government, and elsewhere payable, as from time to time hereafter may be determined by the board of directors), on the 1st day of January, 1961, with interest thereon from January 1st, 1911, at the rate of 4½ per centum per annum, payable semi-annually in like gold coin * * *."
 
 
 8
 All other references in the mortgage and the prospectus to the amount borrowed or to be paid are in pounds sterling.
 
 
 9
 The interest coupon attached to the bond appears as follows:
 
 
 10
 "No. £2 5s.
 
 
 11
 "On the 1st day of Kentucky & Indiana Terminal Railroad Company will pay to bearer two pounds and five shillings, Sterling money of the United Kingdom of Great Britain and Ireland, at the agency of the Company in the City of London, England, free of all taxes as mentioned in the bond, — being six months' interest on its First Mortgage Gold Bond No.
 
 
 12
 Treasurer."
 
 
 13
 The trial judge found that in 1911 the only money which was legal tender throughout the United Kingdom of Great Britain and Ireland was gold coin. 140 F.Supp. 82, 87, note 1. In England at that time gold coin was legal tender for any amount; bronze coins for one shilling or less; silver coins for 40 shillings or less; and Bank of England notes for amounts above £5. Bank of England Act of 1833, 1 Chitty's Statutes 658 (6th Ed.); Coinage Act of 1870, 14 Chitty's Statutes 591 (6th Ed.). England's monetary system was on a gold basis; and Bank of England notes were freely convertible to gold coins of a fixed weight and fineness, as they had been for over one hundred years. The gold coin which was the equivalent of the English pound sterling was the sovereign, which contained .23542 troy ounces of fine gold; and this gold content had existed unaltered for over two hundred years.
 
 
 14
 In 1916 the defendant authorized, upon payment of a 2% premium, the stamping on all bonds presented the additional right to demand payment under these bonds as follows:
 
 
 15
 "In gold coin of the United States of the standard of weight and fineness existing January 1, 1916, at the fixed rate of $4.8665 to the pound sterling."
 
 
 16
 A total of 9,585 of the 1911 issue was so stamped. These bonds are not in suit.
 
 
 17
 In 1925 in its successful application for listing these bonds on the New York Stock Exchange the defendant debtor described the bonds as "payable in gold coin of the United Kingdom of Great Britain and Ireland." Three years later Bank of England notes became legal tender in Great Britain and Ireland, as well as in England. Section 1, Currency and Bank Notes Act, 1928, 18 & 19 Geo. 5, ch. 13. In September 1931 England suspended the convertibility of Bank of England notes into gold and went off the gold standard.
 
 
 18
 The trial judge found that the issuer "since 1911 to date has always serviced these bonds in pound sterling simpliciter. In 1931-1932 inquiry was made of the defendants and their agents as to whether these bonds contained a gold value clause but apparently all bondholders accepted payment in sterling, even though from 1915 to 1925 the value of the pound in United States dollars was substantially less than the $4.86 which existed in 1911. * * * In 1932 Walter Mendelsohn, a bondholder, commenced an action which he amended to a class action in 1933 against the defendants here in the Jefferson Circuit Court of Kentucky for a declaration that these bonds were payable as gold value obligations. The case was never tried and on December 30, 1948, the action was discontinued on the plaintiff's own motion. There was no determination of any kind on the merits in that case." D.C.S.D.N.Y., 140 F. Supp. 82, 84.
 
 
 19
 Under Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477, the New York law is controlling. Since that law refers us back to English law to decide questions of construction and performance of this contract, Swift & Co. v. Bankers Trust Co., 280 N.Y. 135, 19 N.E.2d 992, we are brought to an examination of the English precedents.
 
 
 20
 At the outset it is helpful to distinguish three possible meanings of the word "gold" in a payment clause: (1) prescribing the commodity in which payment must be made, rather than the value of the payment, as the appellant urged in Syndic in Bankruptcy of Salim Nasrallah Khoury v. Khayat, infra, [1943] A.C. 507; (2) prescribing that payment shall have gold value, as in Feist v. Société Intercommunale Belge d'Électricité, supra, [1934] A.C. 161, and as the plaintiff claims here; (3) prescribing nothing, but describing the composition of the currency presently lawful in the country of payment, as in the Court of Appeal opinion in Treseder-Griffin v. Co-operative Insurance Society Ltd., infra, [1956] 2 Q.B. 127, and as the defendant claims here.
 
 
 21
 No English case cited us is similar enough to the present facts to be controlling, although several are instructive where, as here, the parties to the contract never contemplated the facts which subsequently developed and the court had to work out a putative intent. In three House of Lords decisions the Feist construction was adopted, but in all of them the critical clause specified the weight and fineness of the gold coin used as a criterion of value. Feist v. Société Intercommunale Belge d'Électricité, supra, [1934] A.C. 161; Rex v. International Trustee for Protection of Bondholders Aktiengesellschaft, [1937] A.C. 500; New Brunswick Ry. v. British and French Trust Corporation, Ltd., [1939] A.C. 1. Although the absence of words designating the weight and fineness of the gold does not necessarily preclude the possibility of the Feist construction, see Syndic in Bankruptcy of Salim Nasrallah Khoury v. Khayat, supra, [1943] A.C. 507, it makes it much less likely that the draftsman intended such a reading. Treseder-Griffin v. Co-operative Insurance Society Ltd., supra, [1956] 2 Q.B. 127, 152.
 
 
 22
 The Khayat case, supra, presented a different problem from the present one because there only two constructions of the note calling for payment in "gold Turkish pounds" were possible: the Feist construction, which the Privy Council adopted, or the meaning that payment was to be made in specie, rather than paper. The Privy Council never considered the possibility that the word "gold" was merely descriptive of Turkish currency, since at the time the note was made Turkey had long been using depreciated paper money and gold did not circulate. Here, however, gold coin was the only legal tender of Great Britain at the time the bonds were issued, stamped, and listed in London; and we must consider all three possible constructions.
 
 
 23
 The closest English case, we feel, is Treseder-Griffin v. Co-operative Insurance Society Ltd., supra, [1956] 2 Q.B. 127, 129, which is also the most recent English treatment of these clauses. There a lease made in 1938 contained a clause taken from an earlier lease dated July 1932, requiring payment "yearly during the said term either in gold sterling or Bank of England notes to the equivalent value in gold sterling the rent of one thousand nine hundred pounds to be paid * * * by equal quarterly payments * * *." In that case, as in this, the argument for the Feist construction proceeded from the bare reference to "gold" in the payment clause without the help of a specification of weight and fineness. In both cases, too, the court's attention was directed to Dicey's Conflict of Laws 727, rule 162 (6th Ed. 1949), and Mann, The Legal Aspect of Money 114-116 (2d Ed. 1953), where respected text writers stated the English law to be that prima facie, or in the absence of evidence of contrary intent, any reference to gold is presumed to be a definition of the means by which the debt is to be measured, and not a definition of the means by which the debt is to be discharged. In other words, where the choice is between construing the clause as requiring payment in specie and the Feist construction the latter construction is presumably the parties' intention unless otherwise contradicted. However accurate a statement of law this may be as applied to a situation like that in the Khayat case, where these were the only two possible interpretations, the rule is of little assistance where, as in the Treseder-Griffin case and the case at bar, three meanings are possible. In Treseder-Griffin a majority of the Court of Appeal without discussing these text writers applied this last construction to the lease before them. While the decision may not represent the ultimate word in English law, since it was by a divided court, reversing the decision of Lord Goddard, C. J., below, and since the case was settled before it could go to the House of Lords, we think it represents a significant trend based on persuasive reasoning. Accordingly we follow it in construing the present bonds to reach a similar result.
 
 
 24
 The failure to specify weight and fineness of the gold which was to serve as a criterion of value for these bonds may have been due to a tacit assumption that the traditional British coin was intended, but specifications of weight and fineness had been used in British gold value clauses at least as early as 1884. New Brunswick Ry. v. British and French Trust Corporation, Ltd., supra, [1939] A.C. 1. Similarly, there was no pressing reason in 1911 for the parties to be concerned lest Britain go off the gold standard; and we should not read ambiguous words differently from what the parties did at the time. We count it as significant under the circumstances that there was no adverse reaction by the bondholders to the servicing of the bonds in depreciated pounds after Britain went off the gold standard. The trial judge found that after a few inquiries the bondholders accepted payment in depreciated money, and the only legal action brought to construe the bonds as having a gold value clause was allowed to languish until the bondholder eventually discontinued it. The silence of the bondholders persuades us that in common understanding no gold value clause was incorporated in the original agreement. Certainly the issuer and the bondholders were favorably impressed with the fact that these bonds were to be serviced and paid in Great Britain, where the legal tender was gold, rather than a managed paper currency. But the trial judge was correct in concluding that the issuer never undertook to make the bondholders whole in the event that Great Britain some day went off the gold standard.
 
 
 25
 We have considered the other arguments of the plaintiff, and they add nothing further to the discussion.
 
 
 26
 Affirmed.